No. 104,176

STATE OF KANSAS, *Appellee*, v. MISTY D. TAGUE, *Appellant*.

(298 P.3d 273)

Opinion filed March 22, 2013.

*Catherine A. Zigtema*, of Maughan & Maughan LC, of Wichita, argued the cause, and *Carl F.A. Maughan*, of the same firm, was with her on the brief for appellant.

*David Lowden*, chief attorney, appellate division, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Defendant Misty D. Tague appeals her jury trial convictions for felony murder, in violation of K.S.A. 21-3401(b), and aggravated robbery, in violation of K.S.A. 21-3427. She raises five issues in her brief and a sixth issue in a letter of additional authority under Supreme Court Rule 6.09(b) (2012 Kan. Ct. R. Annot. 49). The six issues are: (1) Did the trial judge err in excluding hearsay evidence relating to eyewitnesses who were unable to identify Tague in a photographic lineup? (2) Did the trial judge err in admitting Tague's out-of-court incriminating statements made to her best friend? (3) Did the trial judge err in admitting

certain autopsy photographs at trial? (4) Did the trial judge abuse his discretion in not allowing defense counsel to cross-examine Tague's best friend, who was a witness for the State, regarding the friend's involvement in drug sales? (5) Did the trial judge err by giving an aiding and abetting instruction to the jury? and (6) Did the trial judge err in failing to give lesser included offense instructions?

We conclude the first, second, and sixth issues were not properly preserved or presented for review. Further, we hold that the trial judge did not abuse his discretion in admitting the autopsy photographs or in excluding evidence regarding the witness' involvement in drug sales. Finally, we conclude the trial judge did not err in giving the pattern jury instruction regarding aiding and abetting the commission of a crime. Consequently, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Tague's convictions stem from events that took place at a motel room in Sedgwick County on October 25, 2007. Around 1:22 a.m., law enforcement received a 911 call placed by a woman indicating her boyfriend had been shot. When officers arrived at the motel room, there were two women, Starrie Cross and Alexis Green, and two men, Michael Davidson and Titus Franklin, present. Franklin had been shot and was lying on the floor, cradled in Green's arms. According to Green, a white male and a white female knocked on the door and then pushed their way into the motel room. The male perpetrator told the occupants to "get down" and demanded money. Shots were fired, and the perpetrators rifled through dresser drawers and gathered money and drugs from the room. When questioned at the scene, Green provided a physical description of the assailants. Later, officers showed photo lineups to Green, who identified Tague and Leslie "Country" Keith, Jr., as the perpetrators. Keith eventually confessed to committing the crimes and initially told officers that Tague was his accomplice in the motel room. But at trial, Keith changed his story and testified that another woman, named "Pepper," was his partner in crime.

While interviewing Green at the crime scene, the law enforcement officers learned that just before the shooting a Hispanic male

identified by Green as "Javier" had knocked on the door and had been allowed to come into the motel room. He was there to participate in a drug transaction involving crack cocaine. Once inside, Javier told the others that two people were standing outside by the soda machine. Before Javier could leave, Tague and Keith entered the motel room. Green indicated that Javier was not involved in the robbery.

After Tague and Keith left, Green realized her boyfriend, Franklin, had been shot and called 911. Franklin was shot twice, once in the left thigh and once in the right hip/buttock, and his injuries proved to be fatal. At trial, a criminologist and firearms examiner testified that all the spent shell casings collected from the motel room were fired from the same gun, consistent with a 9 mm. weapon.

Tague's best friend, Miranda Maupin, testified at trial for the State, over defense counsel's objections, about statements Tague had made to her after the incident. According to Maupin, Tague told her that "Country" shot somebody, that he was "in a lot of trouble," and that he had left town. Maupin testified that Tague was "freaking out for a long time." Tague told Maupin that "nobody had to die, that she didn't have anything to do with it, and that Country was . . . trying to prove he was hard and he didn't have to do that and she was really sad."

Testimony from other witnesses in the case indicated that Tague had told Maupin more details than Maupin had provided during her trial testimony. During a telephone conversation with a Sedgwick County Deputy Sheriff, Maupin told the deputy that Tague had admitted to being involved in a homicide with three other individuals—"Country," Dominic Myers, and Tague's brother, Travis Tague. The deputy relayed this information to the Wichita Police Department, which led Detective Thomas Fatkin to interview Maupin. During this interview, Maupin said that Tague had told her she was with "Country" when the murder and robbery took place. Travis and Myers went along but stayed in the van. Tague told Maupin that she and "Country" went into a motel room with guns pointed and the victim was shot by "Country" when the

victim reached for a gun. Maupin also told the detective the group used Myers' work van as the getaway vehicle.

Keith, a/k/a "Country," was the only witness for the defense. His original version of events—relayed during his interrogation by Detective Fatkin—was consistent with the version Tague conveyed to Maupin. Keith acknowledged during his trial testimony that he had told Detective Fatkin that Tague, Travis, and Myers were involved in the crimes. But at trial, Keith claimed that he implicated those three individuals because he thought Tague told officers about Keith's involvement in the crimes. Keith testified that "[i]f somebody was snitching on me I was taking them with me." Keith said he had been motivated by revenge, but when he found out that Tague had not spoken to officers about him, he told his lawyer that he had committed the crimes not with Tague, but with a woman he only knew as "Pepper." He claimed Tague knew about the crimes only because he told her about them. According to Keith, Pepper went to some dude and got a van to use in the crimes. Keith admitted that both he and Pepper had guns at the motel; he always carried a 9 mm. or .45 caliber gun, and Pepper carried a .380 caliber gun.

Detective Fatkin testified about his interrogation of Keith in the State's rebuttal. Fatkin testified that Keith had described how he and Tague were armed with handguns, waited outside by the soda machine, and observed a Hispanic man enter the motel room before they pushed their way in. According to Keith's statements to the detective, his gun was a 9 mm. and he thought Tague's was a 9 mm. gun as well. Keith told Fatkin that when they entered the room, Tague pistol-whipped an older white male. This person turned out to be Davidson, who had a "knot on his head" after the robbery and shooting. Keith told Fatkin the robbery was planned by Myers and Travis, who had already been in the motel room to purchase crack cocaine. Keith shot Franklin when he saw him pull out a handgun.

A jury convicted Tague as charged. Subsequently, the sentencing court imposed a life sentence without possibility of parole for 20 years for the felony-murder conviction. The court imposed a consecutive sentence of 88 months' imprisonment for the underlying

aggravated robbery conviction. Tague brings a timely appeal. This court has jurisdiction under K.S.A. 2012 Supp. 22-3601(b)(3) (maximum sentence of life imprisonment imposed). Additional facts will be discussed as necessary.

## HEARSAY STATEMENTS FROM UNAVAILABLE EYEWITNESSES

Tague first argues that the trial judge erred in excluding hearsay evidence showing that two eyewitnesses from the motel room, Cross and Davidson, had been unable to identify Tague in a photographic lineup.

The State argues Tague failed to preserve this issue for review because defense counsel failed to proffer a basis for the admissibility of the evidence after the State objected on the grounds of hearsay. Accordingly, we must first determine whether the issue was preserved for review and, if not, whether review would nevertheless be appropriate.

Ordinarily, the party arguing for admission of evidence must provide the trial judge with a specific basis for the admission so the judge has a chance to fully consider whether the evidence should be admitted and to avoid any potential reversible error. *State v. Chanthaseng*, 293 Kan. 140, 144, 261 P.3d 889 (2011). More specifically:

> "When a party seeks to admit hearsay testimony but fails to assert the ground upon which it would be admissible, the trial judge is not called upon to make the requisite finding for its admission into evidence. Under these circumstances the defendant is precluded from asserting the ground for the first time on appeal as a basis for error." *State v. Haislip*, 237 Kan. 461, Syl. ¶ 5, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985).

At trial, Tague offered no hearsay exception for the admission of the evidence. When defense counsel first asked Detective Fatkin if Cross or Davidson had been able to identify Tague from the photographic lineup, the State objected on the basis of hearsay. The trial judge asked if counsel had any arguments on the matter, to which defense counsel queried, "Your Honor, may I try to rephrase the question?" With the judge's permission, the questioning continued without defense counsel asking about Cross' or Davidson's ability to identify Tague.

After the State's redirect examination of Detective Fatkin, defense counsel sought permission to approach the bench and, outside the hearing of the jury, stated:

"I don't know quite how to phrase this, Your Honor, but before this witness is excused my client is demanding that she talks to you because she disagrees with some of the things I have done. And I can't get her to listen to me, frankly, and I don't know—I don't want her to fly off the handle here in front of the jury."

The trial judge excused the jury, and defense counsel elaborated that Tague "disagrees with the Court's decision that the failure of two of the witnesses to identify her in the photo array, she disagrees that that should not be admitted." The judge said, "[I]t's a hearsay issue and counsel hasn't set forth any basis. . . . Any basis for that to be admitted?" Defense counsel did not respond with a specific hearsay exception. Instead, the following colloquy took place:

"[DEFENSE COUNSEL]: Your Honor, it was Ms. Tague's opinion since it was in the report and we were reviewing [the detective's] report then that should be allowed because other information from there was let out, I'm not sure if it was the same nature and quality.

"THE COURT: I'm sure you've explained to her just because it's in a report doesn't mean it's admissible in a criminal case or any other kind of case."

The trial judge again repeated that there had to be an applicable hearsay exception before the evidence could be admitted. After some additional comments, the judge stated that "hearsay is [a rule] that applies to both parties. Anything else with regard to that issue . . . ?" The prosecutor then indicated that no part of the statements of the two eyewitnesses "has been entered since it's [sic] hearsay." For a final time, although referring broadly to whether there were any additional issues to be presented, the judge asked, "[I]s there anything else?" The judge then offered defense counsel time to speak to Tague. When the record continued, there was no additional mention of the hearsay issue.

Essentially, the legal rulings made by the trial judge never advanced past the point of the ruling that the line of questioning would call for the admission of hearsay. Following that ruling, the trial judge provided defense counsel repeated opportunities to proffer an exception that would allow the hearsay to be admitted, but defense counsel never took advantage of that opportunity. Al-

though Tague's comments might be viewed as a proffer of an exception for the report itself, there was never any attempt to justify the introduction of the double hearsay regarding the eyewitnesses' statements. As a result, the trial judge was never presented with an opportunity to rule whether an exception allowed the admissibility of the eyewitnesses' statements regarding the photographic lineup.

Significantly, on appeal, Tague does not take issue with the ruling that the statements were hearsay. The question she presents on appeal—whether there was a valid exception for the admission of the hearsay—was not preserved for our review.

Tague, however, argues we should apply an exception to the general rule that new legal theories cannot be asserted for the first time on appeal. We have recognized only three exceptions: (1) where the newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) where consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) where the trial judge is right for the wrong reason. *State v. McCullough*, 293 Kan. 970, 998, 270 P.3d 1142 (2012); *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010). Tague relies on the second exception and contends she should have been allowed to present the evidence because proof that she did not participate in the crimes was an essential part of her defense and justice demands she be allowed to exercise her right to present a defense.

Indeed, as Tague argues, a defendant has a right to present his or her theory of defense, and improperly excluding evidence that is an integral part of that theory may violate a defendant's constitutional right to a fair trial. Nevertheless, this right is not unlimited, but is instead subject to statutory rules and caselaw interpretation of the rules of evidence and procedure. *State v. Houston*, 289 Kan. 252, 261, 213 P.3d 728 (2009).

Here, Tague was allowed to present evidence that she did not participate in the crimes through the testimony of Keith and by cross-examining witnesses in a manner designed to show that someone else committed the crimes. Thus, she presented her theory of defense to the jury. Furthermore, Tague failed to comply

with statutory rules and caselaw interpretation of the rules of evidence and procedure that required her to present to the trial judge a legal theory—a hearsay exception—that supported the admission of the evidence. As such, Tague has failed to establish that consideration of the issue of whether hearsay evidence was admissible is necessary to serve the ends of justice or to prevent the denial of a fundamental right.

Consequently, we do not reach the merits of this issue.

### TAGUE'S OUT-OF-COURT STATEMENTS

Tague next asserts the trial judge erred in admitting evidence of out-of-court statements made by Tague to her best friend Maupin. The trial judge found the statements were admissible as declarations against interest—an exception to the rule against admission of hearsay under K.S.A. 2007 Supp. 60-460(j).

During the State's direct examination of Maupin, defense counsel objected on the basis of hearsay when Maupin began to testify about a conversation that she had with Tague concerning what happened in the motel room. The State argued the evidence was admissible as a declaration against interest. Defense counsel indicated a foundation had to be laid, stating, "I believe the standards are that the considerations must be made as to the circumstances of the statement to whom the statement was made, the condition and trustworthiness of the declarant." The trial judge excused the jury and heard additional arguments, during which defense counsel stated, "I don't disagree it's a statement against interest, but there does have to be a foundation laid before it can be admitted."

On appeal, Tague cites no authority to support her argument that the conditions and trustworthiness of the declarant must be established before evidence can be admitted under the exception in K.S.A. 2007 Supp. 60-460(j) regarding declarations against interest. A failure to support an argument with pertinent authority or to show why the argument is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned. *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010); see Supreme

Court Rule 6.02(a)(5) (2012 Kan. Ct. R. Annot. 38) (appellant's brief must include "the arguments and *authorities* relied on" [Emphasis added.]).

Consequently, we do not reach the merits of Tague's argument.

### AUTOPSY PHOTOGRAPHS

Tague argues the trial judge abused his discretion in admitting gruesome and repetitious autopsy photographs of the victim's body. She contends the photographs were offered solely to prejudice the defendant and create sympathy for the victim. Tague characterizes these photographs as "depicting medical care and instruments, bodily organs pierced with instruments, bloody clothing, and other depictions of autopsy."

We have recently summarized our standard of review for this issue and the relevant caselaw, stating:

" 'The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion.' [Citation omitted.]

"This court also reviews a question of whether evidence is cumulative for an abuse of discretion. [Citation omitted.]

. . . .

"The burden of showing an abuse of discretion rests with the party asserting the error. [Citation omitted.]

"Photographic evidence, like other evidence offered at trial, is relevant and generally admissible if the photographs have a reasonable tendency to prove a material fact in the case. [Citation omitted.] Although they may sometimes be gruesome, autopsy photographs that assist a pathologist in explaining the cause of death are relevant and admissible. [Citations omitted.] However, admitting gruesome photographs simply to ' "inflame the minds of the members of the jury" ' is error. [Citation omitted.] We have also often said that admission of unduly repetitious photographs can constitute an abuse of discretion. [Citation omitted.] The key, as with prejudice, is the word unduly. [Citation omitted.] The admission of photographs in a murder case has rarely been held to be an abuse of discretion. [Citation omitted.]" *State v. Rodriguez*, 295 Kan. 1146, 1156-57, 289 P.3d 85 (2012).

Before we apply this standard of review and caselaw to Tague's arguments, we note that Tague has not preserved her argument regarding all of the photographs she discusses in her brief. She

takes issue on appeal with the admission of seven photographs, admitted as State's Exhibits 5A, 5P, 5T, 5U, 5V, 5Y, and 5Z. Yet, at trial, defense counsel indicated that the defense had no objection to Exhibit 5A. Therefore, the issue of that photograph's admission was not preserved for appeal. See K.S.A. 60-404; *State v. Sappington*, 285 Kan. 176, 195, 169 P.3d 1107 (2007).

Tague did object to the six other photographs, which were taken during the autopsy of the victim and admitted during the coroner's testimony. Prior to their admission, the trial judge conducted a hearing outside the presence of the jury to determine admissibility. During this hearing, defense counsel objected to the photographs as inflammatory, unnecessary, gruesome, and more prejudicial than probative. The trial judge examined all the photographs and noted that some of the photographs depicted the victim's body and wounds but noted "there is no particular significant blood shown." Nevertheless, the trial judge indicated that three photographs, 5T, 5U, and 5V, caused some concern because they depicted internal organs. Because of this concern, the judge entertained a voir dire examination of the coroner concerning the photographs.

The coroner testified that photographs 5U and 5T showed the "inferior vena cava, which is the largest vein in the body," and the "gunshot injury to the vein." Photograph 5V showed "the injury from the gunshot wound to the right common iliac artery." The coroner then explained that the "injury to these vessels . . . is essentially the fatal wound for the decedent." The trial judge also asked the coroner about photograph 5Y, which depicted the victim's kidney after it had been removed from the body. The coroner testified that the photograph showed that "the projectile did penetrate the kidney."

The trial judge admitted the photographs after concluding:

"[N]one of these photographs distort the actual premise for which they are offered, they do not appear to me to have been introduced for the primary purpose of inflaming the passions of the jury. I don't find them to be particularly gruesome and they do not appear to be unduly repetitious or cumulative in any way. They do appear to me to depict the victim and his clothing from different angles and different aspects. Frankly, don't see any basis to exclude any·of the photographs, so . . . I will over the objection of defense admit State's Exhibit[s] 5B through 5Z . . . ."

Following this ruling, the coroner used the photographs to explain the injuries and the reason the injuries caused death, and each of the six photographs was offered to support a different aspect of the coroner's testimony. The photographs were not overly repetitious and were not more gruesome than necessary for the relevant purposes. Therefore, we conclude the trial judge did not abuse his discretion in admitting the autopsy photographs.

### CROSS-EXAMINATION REGARDING WITNESS' DRUG SALES

Next, Tague contends the trial judge impermissibly limited defense counsel's cross-examination of Maupin when he sustained the State's objections to any questions about Maupin's involvement with the sale of drugs. She argues that the trial judge's ruling prevented a full and complete assessment of Maupin's credibility and, specifically, her ability to perceive events, in violation of Tague's right of confrontation under the Sixth Amendment to the United States Constitution.

This issue arose during the cross-examination of Maupin when defense counsel attacked her credibility by eliciting testimony about the effect of drug use on her cognitive abilities. Defense counsel established that both women were regularly using drugs during the time period Tague spoke with Maupin about the motel robbery and shooting. When asked "which" drugs Maupin was using, she said, "Everything." Maupin testified that her ability to fully understand conversations was dependent on how many consecutive days she had been awake.

On redirect examination, Maupin testified that she was pregnant at the time she spoke with Detective Fatkin about Tague's statements and was generally not using drugs, although she admitted to having a "couple" of relapses. On recross-examination, Maupin clarified that she was frequently using drugs during the time Tague told her about the motel crimes, but she was not using drugs at the time she was talking to Detective Fatkin. Defense counsel then asked, "Were you involved in drugs at all, buying or selling during that time?" The State objected on the basis of relevance and also argued that the question went beyond the scope of the State's redirect examination.

The trial judge heard arguments on the matter. During this hearing, defense counsel explained that he was attempting to impeach Maupin's credibility:

"The relevance is that I want to know . . . how active she was in the drug area at the time because that's going to . . . affect . . . whether we can trust her when she says she wasn't using during the time she was pregnant. And as far as it being beyond the scope of direct [*sic*], it's still within . . . the parameters of the drug usage and I'm trying to get to usage, *not necessarily the sale*, but I want to find out what contact she had with that culture during that time to help the jury determine what part of her testimony can be trusted." (Emphasis added.)

The State then argued, "I don't know how you're going to find that out by asking if [she] sold or bought drugs." The trial judge ruled that Maupin's *use* of drugs could be explored, but not the *sale* of drugs: The judge recognized that "the use of drugs . . . would certainly go to her ability to perceive and memory, those kinds of things, but I'm not compelled to see where anything with regard to the sale of drugs would be."

On appeal, Tague quotes *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008), for its statement that " '[t]he cross-examiner should have wide latitude in establishing partiality, bias, motive or interest.' " She contends that given the "link between sale and use for narcotics users," if Maupin had admitted to selling drugs, such testimony "may" have led to "further information regarding use or abuse of drugs during the time of perception or the time she communicated such statements to law enforcement. . . . As such, the statements should be admissible in attacking the perception of the witness at the time of the event."

In making this argument, Tague, as the person alleging error, carries the burden of establishing that the trial judge abused his discretion in limiting the cross-examination by excluding evidence he did not deem sufficiently probative of a material issue. See *Rodriguez*, 295 Kan. at 1156 (burden of proof rests with party asserting error); *State v. Reid*, 286 Kan. 494, 508, 186 P.3d 713 (2008) (probative element of relevance reviewed under an abuse of discretion standard); *State v. Corbett*, 281 Kan. 294, 307-08, 130 P.3d 1179 (2006) (trial judge's decision to limit cross-examination reviewed under abuse of discretion standard). A judicial action constitutes

an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). In both the determination of whether a trial judge erred in weighing the probative value of evidence and in limiting cross-examination, the applicable standard for an abuse of discretion is whether the judicial action is arbitrary, fanciful, or unreasonable *i.e.*, no reasonable person would take the view adopted by the judge. See *Ward*, 292 Kan. 541, Syl. ¶ 3; *Berriozabal*, 291 Kan. at 586 (question of whether evidence is probative); *Corbett*, 281 Kan. at 307-08 (cross-examination).

In this case, the trial judge recognized Tague's right to impeach Maupin and, in fact, allowed her to do so by questioning Maupin about her drug use. See *State v. Belote*, 213 Kan. 291, Syl. ¶ 4, 516 P.2d 159 (1973) (evidence of drug use may be admissible for impeachment where witness was under the influence of drugs at the time of the events or the witness' mind, memory, or powers of observation were affected by the habit). The judge drew a line, however, at evidence that the judge did not deem probative. Before us, Tague has presented an argument that, at best, establishes an extremely tenuous link between the question asked and possible impeachment evidence. Reasonable people would agree with the trial judge that the evidence lacked sufficient probative value to be admitted. Consequently, Tague has failed to meet her burden of establishing that the trial judge's ruling was arbitrary, fanciful, or unreasonable.

## Aiding and Abetting Jury Instruction

Tague also argues the trial judge erred by giving Instruction No. 7, an aiding and abetting instruction, which was based on PIK Crim. 3d 54.05 and stated:

"A person who, either before or during its commission, intentionally aids, abets, counsels and/or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Tague's argument has two primary contentions. She first claims the aiding and abetting instruction should not have been given because the jury could have been confused by it and convicted Tague based on her knowledge of events *after* they occurred rather than based on evidence of her participation in the crimes. Second, she claims the aiding and abetting instruction impermissibly lessened the State's burden of proof because it contained no foreseeability requirement. Tague contends that Franklin's death had to be a foreseeable result of the motel robbery before she could be convicted of felony murder.

In *State v. Plummer*, 295 Kan. 156, 283 P.3d 202 (2012), this court established the analytical framework for instructional issues with corresponding standards of review. We stated:

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *Plummer*, 295 Kan. 156, Syl. ¶ 1.

## Jury Confusion Issue

Regarding the first step of whether an issue of jury confusion was properly preserved, the parties in this appeal take differing views. Tague's appellate counsel focuses on an objection made during the preliminary phase of the jury instructions conference. At that point, defense counsel argued that the aiding and abetting instruction would be "confusing" because "[s]ome of the testimony indicated that perhaps [Tague] learned about the crime after the fact and that she didn't report it and . . . maybe [the jury would think] . . . this would require a finding of guilt." The trial judge observed that the instruction accurately stated the law and noted that defense counsel "would certainly be able to point out to the jury it says a person who [acted] either *before or during* its com-

mission." (Emphasis added.) Defense counsel agreed that the plain language of the instruction required consideration of behavior before or during the crime but did not want the jury "to be confused." Clearly, at this point, an objection was made to the confusing nature of the instruction.

Nevertheless, the State focuses on a later exchange, after the trial judge prepared the final jury instructions, during which the State argues defense counsel "let the matter drop" by failing to "lodge an objection to the final form of the instruction." This contention is not persuasive in light of the record, however. The trial judge, after providing the parties with the final version of the instructions and verdict forms, acknowledged the parties' previous objections to the jury instructions and stated, "I want to make sure there's nothing *else* anybody has with regard to each page of the instructions and the two verdict forms." (Emphasis added.) This exchange suggested the judge was seeking *additional* objections or arguments pertaining to the final version of the jury instructions. Under those circumstances, it was not necessary for defense counsel to repeat the objections in order to preserve them for appeal.

Having concluded the objection was adequately made, we next consider whether the aiding and abetting instruction was legally appropriate. In doing so, we exercise de novo review. See *Plummer*, 295 Kan. 156, Syl. ¶ 1.

Tague contends that, while the instruction accurately and correctly stated the law, the instruction was inappropriate because "defendant's general knowledge of the event could be misconstrued as intentionally aiding and abetting during the offense." Tague does not explain *how* the jury could have possibly been confused, however. As Tague acknowledges, the aiding and abetting instruction accurately focused on the defendant's behavior before and during the crimes, *not* on knowledge gained after the fact or even the subsequent failure to report the crimes. This court presumes the jury followed the instructions given. See *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). Nothing in the record suggests the jurors did not follow the instructions in reaching the verdict.

Further, the evidence supported an aiding and abetting instruction. Tague's arguments regarding jury confusion assume that she did not participate in the crimes and was not at the scene. But the State's evidence, primarily through the testimony of Green who was present in the motel room during the crimes, Maupin, and law enforcement officers, supported the State's theory that Tague was present at the motel room and actively participated in the robbery. The trial judge did not err in rejecting Tague's jury confusion argument and in giving the aiding and abetting instruction.

*Foreseeability Requirement*

Turning to Tague's next argument regarding the jury instruction, we return to the four steps of analysis set forth in *Plummer*. Regarding the preservation issue, there is no dispute that Tague never raised the foreseeability issue before the trial judge. In *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012), which was decided shortly after *Plummer*, we recognized that the clearly erroneous standard of K.S.A. 22-3414(3) applies if there was not a specific objection to the instruction during the trial. See *Ellmaker*, 289 Kan. at 1138-39 (under K.S.A. 22-3414[3], if at trial a party did not state the specific objection raised on appeal but rather a different objection, a clearly erroneous standard of review applies).

In *Williams*, we observed that our past caselaw tended to blend or conflate the determinations of appellate reviewability, error on the merits, and reversibility of the error. *Williams* established the following framework when a jury instruction is claimed to be clearly erroneous: (1) Utilizing the unlimited review applied to legal questions, the reviewing court first determines whether the instruction or the failure to give the instruction was erroneous; and (2) if error is found, the court must review the entire record to make a de novo determination of whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. *Williams*, 295 Kan. at 515-16.

We, therefore, begin our analysis of the foreseeability issue by applying an unlimited standard of review to the question whether it was error at all to omit a foreseeability requirement from the instruction. We conclude it was not because this court rejected the

same argument under nearly identical circumstances in *State v. Gleason*, 277 Kan. 624, 638, 88 P.3d 218 (2004) (victim's death does not have to be foreseeable result of burglary or other inherently dangerous felony in order for defendant to be convicted of felony murder, and thus aiding and abetting instruction was not required to include foreseeability requirement). Tague fails to present any persuasive reasons for us to overturn *Gleason*.

Because the trial judge did not err in giving the aiding and abetting instruction as written, there is no need to move on to a reversibility inquiry. See *Williams*, 295 Kan. at 515-16.

### Rule 6.09 Lesser Included Offense Argument

Finally, Tague submitted a letter of additional authority under Supreme Court Rule 6.09(b) (2012 Kan. Ct. R. Annot. 49) in which she asked the court to consider *State v. Berry*, 292 Kan. 493, Syl. ¶ 6, 254 P.3d 1276 (2011), as authority supplementing her "previously submitted brief as part of Section IV," which is the issue related to the scope of the cross-examination of Maupin. This court granted the motion.

At oral argument, however, it became clear that Tague's appellate counsel was not citing *Berry* in support of the issue regarding the cross-examination of Maupin. Rather, Tague was raising an entirely new issue not stated in her brief—whether the trial court erred in failing to give lesser included offense instructions on second-degree murder and involuntary manslaughter. Consequently, at oral argument the court questioned whether a Rule 6.09(b) letter was an appropriate vehicle for raising an entirely new issue on appeal. Following oral argument, Tague filed a motion to construe her prior Rule 6.09(b) letter as a supplemental brief or to permit supplemental briefing. Both her attempt to raise a new issue through her Rule 6.09(b) letter and her belated attempt to file a supplemental brief fail.

Rule 6.09(b) letters are reserved for citing significant relevant authorities not previously cited which come to a party's attention after briefing. We have previously held that an appellate court will not consider new issues raised for the first time in a party's Rule 6.09(b) letter. See, *e.g.*, *State v. Houston*, 289 Kan. 252, Syl. ¶ 13,

213 P.3d 728 (2009) ("[Rule 6.09] was not intended to be, nor should it be, used as yet another briefing opportunity."). Our order allowing Tague to file her Rule 6.09(b) letter did not except this case from that rule. Our consideration of the new issue is prohibited by *Houston* and similar cases.

Further, while a supplemental brief may have been a more appropriate vehicle for raising a new issue with the court, a motion to file a supplemental brief that is submitted after oral arguments is not timely. See Supreme Court Rule 6.01 (2012 Kan. Ct. R. Annot. 37). The motion is denied.

Consequently, we will not address the issue raised for the first time in Tague's Rule 6.09(b) letter.

Affirmed.